Filed 12/9/21  Edith D. v. Superior Court CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| EDITH D.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>    Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al.,<br><br>    Real Parties in Interest. | A163378<br><br>(Contra Costa County Super. Ct. Nos. J19-00710, J19-00711) |

Edith D. is the adoptive mother of Joseph A. and the legal guardian of Bobbie A., who were both taken into protective custody in August 2019.  In August 2021, the juvenile court held a contested, combined 18- and 24-month review hearing at which it terminated reunification services as to Edith D. and set a permanency planning hearing under Welfare and Institutions Code section 366.26.[1]  Edith D. filed a petition for extraordinary writ relief contending (1) that the juvenile court should have continued reunification services under section 352 because there had been a lack of reasonable

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

reunification services and (2) that the juvenile court should have considered federal law.  She also requested a stay of the section 366.26 hearing.  We deny the petition and the stay request.

<strong>FACTUAL AND PROCEDURAL BACKGROUND</strong>

## I. *Detention/Jurisdiction Report*

On August 6, 2019, the Contra Costa County Children and Family Services Bureau (Bureau) filed petitions under section 300, subdivision (b) alleging Edith D. placed eight-year-old Bobbie A. and six-year-old Joseph A. at substantial risk of physical harm and neglect by failing to adequately supervise them.  Specifically, the petitions alleged that on August 2, 2019, the minors left home unsupervised and were found hours later a mile and a half from their home wearing only shorts and sweatpants.

The Bureau's August 7, 2019, detention/jurisdiction report provides further details regarding prior events leading up to the August 2 incident.

### A. Prior Incidents and Bureau Involvement

On May 17, 2019, the Bureau received a report that Bobbie A. was " 'sneaking' " into the Antioch fairgrounds with another child.  (Italics omitted.)  The reporting party contacted the police, who returned Bobbie A. to his home and found then five-year-old Joseph A. home alone.  Edith D. arrived home 15 minutes later and stated she had gone to look for Bobbie A.  The Bureau instructed that the minors be released to Edith D. with an admonishment that she not leave them home alone.  The next day, the Bureau received another report, that Bobbie A. returned to the fairgrounds without adult supervision.  The police contacted Edith D.  She informed them that she had broken her wrist and was out filling prescriptions.  When she arrived at the fairgrounds to pick up Bobbie A., she explained that she had left him with a neighbor but that he ran off to the fairgrounds.  She asked the

2

police whether Bobbie A. could work off his fine.  The police told her there was no fine but she needed to supervise Bobbie A.

On May 30, 2019, a Bureau social worker contacted Edith D. regarding these incidents.  Edith D. was reportedly agitated and defensive about the prior incidents.  She shifted blame onto Bobbie A.  She explained that Bobbie A. was playing with another child in the front yard while she and Joseph A. were lying down in the bedroom.  She fell asleep, and when she woke up she realized Bobbie A. and the other child were gone.  She went out to look for them and left Joseph A. home because he was sleeping.  The social worker explained the Bureau's concerns regarding leaving the minors unattended, and Edith D. agreed to a safety plan and to participate in a "Team Decision Making" meeting.  The social worker provided information regarding community resources for childcare.  On June 12, 2019, Edith D. participated in the team meeting with several social workers, a family friend, and a mental health liaison.  At the meeting, it was agreed the family would participate in the Bureau's intensive family services program, which included therapeutic behavior services, wrap meetings, and multiple home visits by the social worker over the next several months.

During several of the home visits, the social worker found that Bobbie A. had left home without permission.  The social worker reiterated the Bureau's expectation that the minors be supervised at all times.  Edith D. initially explained that the park was only a few blocks away and there were other families around, but she ultimately agreed not to allow the children to wander the neighborhood without supervision.  During one of the social worker's visits, Edith D. went to look for Bobbie A. and eventually returned with him.  The social worker observed that Bobbie A. was riding an electric toy motorcycle and was not wearing a shirt or shoes.  On a separate visit,

Edith D. was just arriving home in her car with both minors in the front seat without booster seats. Again, both minors were not wearing shirts or shoes. She explained to the social worker that she had booster seats for the minors and knew they should be in the back seat but that she had only gone around the corner to pick them up.

During the July 29, 2019, meeting with the Contra Costa Therapeutic Behavioral Services (TBS) worker and manager, the children were disruptive and aggressive with each other and would not listen to Edith D. when she tried to redirect them. The social worker discussed safety precautions such as locks for doors and windows. The next day, during an emergency wrap meeting, the social worker received a call from the TBS worker saying the children had "taken off" and the wrap facilitator was looking for them. The social worker drove around the neighborhood and found Joseph A. a block away, walking toward home wearing no shoes or shirt. Joseph A. said he had been at his friend's house down the street. Bobbie A. walked home from a neighbor's house, also without shoes. The social worker observed that Edith D. was visibly shaken. Edith D. explained that the children snuck out while she was bringing groceries into the house.

Again, the children were disruptive during the wrap meeting. Bobbie A. became upset when he was not permitted to use Edith D.'s phone. He ran into the yard, climbed on the roof and refused to come down. Eventually, the wrap facilitator was able to help Bobbie A. come down. Edith D. was stressed and frustrated that the minors would not listen to her. At one point, Joseph A. hit her with a pillow and would not stop. Edith D. spanked him once. The TBS worker suggested local youth programs and arranged to meet with Edith D. on August 1 and 2 to assist with completing scholarship applications.

On August 1, when the TBS worker arrived at the home, Edith D. said she forgot the TBS worker was coming and she let the children go to the park where there were "other families around." When asked about the locks that had previously been discussed, Edith D. said she did not have money for locks. The TBS worker told Edith D. the minors needed to be in the home for their sessions, and they arranged to meet again the next day.

**B.     August 2, 2019 Incident**

On August 2, 2019, the TBS worker arrived at the home at 1:30 p.m., and the minors were again not there. Edith D. went to look for them but returned after 20 minutes without the minors. The TBS worker told Edith D. to call the police, and when Edith D. said her phone was still charging, the TBS worker called from her own phone. Edith D. did not know what time Bobbie A. left, but she reported that Joseph A. left around 11:30 a.m. At 4:15 p.m., the police found the minors at a store 1.4 miles from their home. They were not wearing shoes or shirts, and they reported they had not eaten all day except for some candy.

The Bureau reported it previously investigated eight referrals alleging neglect or caretaker absence regarding each of the minors from 2015 to 2019. All of the referrals regarding Joseph A. were determined to be unfounded. As to Bobbie A., seven of the referrals were determined to be unfounded and one was determined to be inconclusive. It also reported that in 2015, when Edith D. was a licensed foster care provider, a newborn baby died in her care.

The Bureau concluded that although Edith D. was meeting the minors' basic needs, loved them and tried to advocate for them, she was not providing adequate supervision, which put the minors at substantial risk. The Bureau recommended that the minors be detained and that their case be promoted from an intensive family services case to a juvenile court case.

## II.  *Detention and Jurisdiction Hearings*

On August 7, 2019, the court ordered the children detained, and Edith D. was granted supervised visitation a minimum of one hour a week. Parenting education and counseling were ordered for both Edith D. and Bobbie A.'s biological father.[2]  On October 24, 2019, Edith D. pleaded no contest and the juvenile court sustained the allegations finding the minors came within the juvenile court's jurisdiction.  Father's status was raised to presumed father of Bobbie A.

## III.  *Disposition*

The Bureau filed a disposition report for the November 21, 2019 disposition hearing regarding Joseph A., who had been placed in a foster home with Bobbie A.  The report stated Joseph A. had been diagnosed with attention-deficit/hyperactivity disorder, for which medication had been prescribed.  Edith D. had been visiting weekly with both minors under the supervision of the Seneca Family of Agencies.  The visitation supervisor described the visits as extremely difficult due to Edith D.'s inability to effectively discipline the children.  At one visit, one of the minors threw fruit at Edith D. and she responded by engaging in a food fight.  The minors also ran away from Edith D. during visits and did not respond to her directives. In contrast with the visitation supervisor's observations, Edith D. reported that the minors listened to her and there was nothing wrong with their behavior during her visits.  The Bureau recommended continued supervised visitation, counseling and parenting classes for Edith D.  The juvenile court

---

[2] Edith D. is Bobbie A.'s paternal aunt.  She became Bobbie A.'s guardian after father was incarcerated, when Bobbie A. was two months old. Bobbie A. and Joseph A. are half siblings on their mother's side.

6

adopted the Bureau's recommendations and scheduled a six-month review for May 7, 2020.

Bobbie A.'s disposition hearing was continued until January 2, 2020, to allow time for the Bureau to investigate the background of father. Bobbie A. was removed from father's care when he was two months old, and father waived his reunification rights because he was incarcerated at the time. Bobbie A. was also diagnosed with attention-deficit/hyperactivity disorder and prescribed medication. The Bureau recommended the same reunification services for father as it had for Edith D., and the juvenile court adopted the recommendations.

## IV. *Six-month Review*

In a May 7, 2020 report, the Bureau stated that Edith D. continued to participate in weekly supervised visits at Seneca, where she received assistance in managing the minors' behaviors and setting boundaries. She also completed seven sessions of a parenting class. Since March 2020, the weekly visitation had been conducted virtually. However, the Bureau stated its concern that Edith D. was not accepting responsibility for her lack of parenting techniques, and despite feedback from the therapeutic team and completing the parenting classes, Edith D. did not understand the severity of the children's behavior. Edith D. reportedly blamed the Bureau and the foster family instead of holding herself accountable. The Bureau recommended, and the juvenile court ordered, continued reunification services, including authority for overnight visits for a maximum of two days with 72 hours' advance notice.

## V. *Twelve-month Review Regarding Joseph A.*

The Bureau's October 8, 2020 report stated that Edith D. continued to struggle to maintain control over the minors during supervised visits at

Seneca. It reported that the minors obeyed and responded to their foster parents and while in school but not when they were with Edith D. During one supervised visit, Joseph A. left the building and wandered into the parking lot. Edith D. delayed responding to the situation, and she required assistance to bring Joseph A. back inside. The Bureau requested additional time to work with Edith D. and suggested wrap-around services to transition her to overnight visits. The juvenile court adopted the recommendations.

## VI. *Combined 12-month Review Regarding Bobbie A. and 18-month Review Regarding Joseph A.*

In advance of a combined 12-month review hearing for Bobbie A. and 18-month review hearing for Joseph A., the Bureau filed reports dated January 21, 2021. The minors had been moved together to a new foster family home. The Bureau reported that although Edith D. was motivated to regain custody and had engaged in therapy, parenting classes, supervised visitation, and meetings with the Bureau social worker, she was still not capable of caring for the minors. During supervised visits, the staff continued to have to intervene to address the minors' behavior. After a trial overnight visit in November, Bobbie A. returned to his foster home and reportedly acted withdrawn and not himself. Joseph A. reported that Edith D. cursed at Bobbie A. throughout the visit. The overnight visits were terminated due to the neglect of Bobbie A.'s emotional well-being. The Bureau reported that Edith D. was not engaging with the Bureau in a reasonable manner and had exhibited agitation and aggression toward Bureau workers.

Visitation with Bobbie A.'s father, including four overnight visits, went well. Father planned to begin a parenting course and was committed to caring for both Bobbie A. and Joseph A. The Bureau believed that with further assistance from the Bureau, father had a strong potential of

8

reunifying with Bobbie A. It recommended termination of reunification services to Edith D. and that father assume physical custody of both minors subject to the juvenile court's supervision. At Edith D.'s request the matters were set for a contested hearing on March 25, 2021.

The contested hearing was delayed due to multiple unfortunate events between February and August 2021. Father died unexpectedly in mid-February 2021. Then the Bureau social worker and supervisor both went on medical leave. On May 27, 2021, the Bureau received a report that Edith D. had been, and remained, hospitalized after suffering a stroke which caused partial paralysis of her left side. Following her hospitalization, Edith D. entered a rehabilitation facility and then returned home by early August 2021.

Between April and July 2021, the Bureau submitted two status updates. The April report stated the minors were both making "immense progress" in their new foster home. They were receiving therapy and participating in a grief support group after the death of father. The Bureau identified an adult paternal sibling of Bobbie A. as a possible guardian. Prior to Edith D.'s stroke at the end of May, the weekly supervised visitation continued, but the Bureau reported that it had difficulty engaging with Edith D. During March and April, Edith D. delayed responding to the social worker's phone calls, and during one call she shouted at the social worker, demanding that her children be returned to her. The social worker reported that he initiated a referral for therapeutic visitation but that those services did not occur due to limited availability. The Bureau also reported that Edith D. was actively participating in therapy once a month but was making only minimal progress, and the therapist had concerns she was not accepting accountability for neglect of the minors. The report stated the social worker

9

attempted to contact the therapist for an update and to request a mental health assessment.

The Bureau's July 2021 report summarized the minors' progress in their foster home, where they were both learning self-regulation and conflict resolution skills. Prior to Edith D.'s stroke at the end of May, she continued to participate in weekly supervised visitation through Seneca but had "extreme difficulty" managing the minors' behavior. She did not maintain monthly contact with the Bureau and failed to participate in a child family team meeting on April 14, 2021. The Bureau continued to have serious concerns that unsupervised visits would place the minors in immediate danger because they were defiant in the presence of Edith D. The Bureau concluded that Edith D. remained unable to meet the minors' emotional and physical needs, and it again recommended termination of reunification services to Edith D. Bobbie A.'s adult paternal sister had expressed interest in guardianship, and the Bureau recommended working to transition both minors to her care. It also reported that if placement with Bobbie A.'s sister was not feasible, the minors' current foster parents had offered to obtain guardianship.

## VII. *Contested 18- and 24-month Review*

The Bureau provided a final report to the court prior to the continued contested review hearing on August 19, 2021. It was prepared by a substitute social worker because the original social worker was on leave. The substitute social worker reported that after multiple unsuccessful attempts to contact Edith D. by phone, she made an unannounced visit to Edith D.'s home. During the visit, Edith D. was very emotional about being separated from the minors, her physical health following her stroke, and the recent deaths of her brother (Bobbie A.'s father) and her stepsister. Since Edith D.

10

returned home after being hospitalized for a stroke, her adult son, who lived in Las Vegas, was staying with her to help care for her. She had asked her physical therapist if Bobbie A. could come to her physical therapy sessions to learn how to help her stand, but the therapist told her both boys were too young. At one point during the visit, the social worker heard about seven gunshots outside and the police arrived at the end of the block. Edith D. seemed unalarmed even when her adult son came to check on her. The Bureau reported that the minors continued to thrive in their foster home, and although they seemed open to possibly living with Bobbie A.'s sister in Sacramento, they liked their foster home.

The original social worker was ordered to appear at the August 19, 2021 hearing, but because he was still on medical leave, a supervisor appeared instead. The supervisor testified, based upon the records in the file, that Edith D. regularly participated in supervised visits through Seneca prior to her stroke but there were no visitation notes in the file. The supervisor acknowledged that the prior social worker failed to schedule a visit on Joseph A.'s birthday on July 9th, although he had been requested to do so. She also acknowledged that no wrap-around services were initiated for the family. Based on the supervisor's review of the recent home visit report, she believed Edith D. was emotionally and physically unable to take custody of the children. Although the supervisor recognized Edith D.'s love for the children, she explained that the Bureau had serious concerns about Edith D.'s physical ability to care for them. Additionally, the Bureau was concerned with Edith D.'s therapist's report that she had not accepted accountability for her neglect of the children and the implications of her actions.

11

Edith D. argued the Bureau had not provided reasonable services since January 2021. She asserted that the only service provided between January and August 2021 was visitation and that this was inadequate, particularly given that the Bureau stated it would seek a referral for wrap-around services that were never implemented. Edith D. did not specifically request that the August 19, 2021 hearing be continued under section 352.[3] Nor did she argue there was good cause to continue the hearing. The Bureau responded that it had provided therapy, case management, and visitation services to Edith D. and to the children, but Edith D.'s therapist reported she had made insufficient progress. The Bureau requested termination of reunification services to Edith D., and the minors' counsel agreed with the recommendation.

The juvenile court found that, viewing the case in its entirety, reasonable services were provided to Edith D. It stated that returning the minors to Edith D. would place them in the same dangerous situation from which they had been removed because Edith D. was still not able to adequately control their behavior or supervise them. The juvenile court terminated reunification services and set the matter for a section 366.26 hearing.

## DISCUSSION

Relying on *In re D.N.* (2020) 56 Cal.App.5th 741, Edith D. argues the lack of adequate reunification services constitutes extraordinary

---

[3] Section 352, subdivision (a)(1) & (2) provides in relevant part, "Upon request of counsel . . . , the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor," and, "Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."

circumstances such that the juvenile court should have invoked section 352 to extend family reunification services beyond the statutory time limits. Ordinarily, the maximum time period for reunification services is no more than 18 months, but the period may be extended to 24 months under certain circumstances. (§§ 361.5, subd. (a)(3), 366.22, subd. (b), 366.25.) *In re D.N.* recognized, "Notwithstanding these statutory limits on reunification services, a juvenile court may invoke section 352 to extend family reunification services beyond these limits if there are 'extraordinary circumstances which militate[] in favor of' such an extension." (*In re D.N., supra*, at p. 762.) Extraordinary circumstances may exist where inadequate services are offered or " 'an external force over which [the parent has] no control' " prevented the parent from completing the case plan. (*Ibid.*)

Here, although Edith D. contested the termination of reunification services, she did not specifically argue that services should be permitted to continue under the authority of section 352. Accordingly, the juvenile court was not asked to, and did not, make a finding under the standards of section 352. A party who fails to request a continuance generally forfeits any argument that a continuance should have been granted. (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1366.)

Even if we were to consider Edith D.'s claim that the juvenile court should have exercised its authority under section 352 to continue her reunification services, we would reject it. "Continuances are discouraged [citation] and we reverse an order denying a continuance only on a showing of an abuse of discretion [citation]." (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810–811.) An abuse of discretion is found " ' "when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice." ' " (*In re D.N., supra*, 56 Cal.App.5th at p. 756.) Edith D. argues

13

that the reunification services she received were inadequate, and she specifically notes that wrap-around services were not implemented and the social worker failed to obtain a psychological evaluation from Edith D.'s therapist in April 2021.[4]  But she fails to address the factors the juvenile court must consider in determining whether good cause exists under section 352 to warrant a continuance, including that "a continuance shall not be granted that is contrary to the interest of the minor" and that "[i]n considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."  (§ 352, subd. (a)(1).)

Here, the Bureau's status reports consistently raised concerns based upon observations during supervised visitation that Edith D. continued to lack the ability to control the minors' behavior.  Nor had Edith D. acknowledged her failure to properly supervise the minors.  As the juvenile court found, returning the minors to Edith D.'s care would be returning them to the same hazardous situation from which they had been removed.  This case does not share the "unique circumstances" present in *In re D.N.*, where the father made substantial progress toward alleviating the causes necessitating placement; applied for housing at multiple locations but was

---

[4] Edith D. also asserts, "Hospitalization can be another external force over which a parent has no control," and cites *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774.  However, she does not develop any argument as to how her hospitalization, which began at the end of May 2021 (over 18 months after the minors were removed from her custody and 24 months after the Bureau began providing her services through its intensive family services program), impacted her reunification efforts or otherwise constituted an extraordinary circumstance militating in favor of an extension.  Her conclusory statement is without merit.

14

unable to obtain suitable housing due to his poverty; and the minor, who consistently failed to thrive in group and foster homes, strongly wished to live with his father. (*In re D.N., supra*, 56 Cal.App.5th at pp. 764–766.) In contrast, under the circumstances here, it was not an abuse of discretion to deny any implied request for a continuance under section 352.

Further, we find substantial evidence supports the juvenile court's finding that Edith D. was provided reasonable reunification services.[5] The services provided to Edith D. included supervised visitation, where she received assistance in managing the minors' behavior and setting boundaries; parenting classes; therapy; and case management. Even before the petitions were filed in August 2019, the Bureau began providing services to the family through its intensive family services program. These services continued in some form through 2020 and 2021. We agree that, based on the record, it appears that wrap-around services were not implemented in the spring of 2021, as the Bureau requested. Nor does the record indicate that the Bureau obtained a mental health assessment from Edith D.'s therapist. Nonetheless, substantial evidence supports the juvenile court's finding that over a two-year period reasonable services were consistently provided to Edith D. to attempt to remedy the problems alleged in the petition. (See *In re Misako R.* (1991) 2 Cal.App.4th 538, 547 ["The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances"].)

---

[5] Because the trial court's finding was made under the clear and convincing evidence standard, "[w]e review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings *based on the clear and convincing evidence standard*." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.)

Finally, Edith D. argues under the heading "**CONSIDER FEDERAL LAW**" that the Family First Prevention Services Act of 2018 "eliminates time limits on reunification services when a child is placed in foster care," and she cites title 42 United States Code section 629a(a)(7). We reject this argument because it was not raised below and is therefore forfeited. (*In re A.B., supra*, 225 Cal.App.4th at p. 1366.) Moreover, title 42 United States Code section 629a(a)(7) defines "family reunification services" but does not state that it "eliminates time limits on reunification services" under California law.[6] Edith D. provides no analysis as to how the federal law alters California state law as applied to her case.

## DISPOSITION

The petition for extraordinary writ is denied on the merits. (Welf. & Inst. Code, § 366.26, subd. (*l*)(1)(c); Cal. Rules of Court, rule 8.452.) The request for a stay is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

---

[6] Title 42 United States Code section 629a(a)(7)(A) states: "The term 'family reunification services' means the services and activities described in subparagraph (B) that are provided to a child that is removed from the child's home and placed in a foster family home or a child care institution or a child who has been returned home and to the parents or primary caregiver of such a child, in order to facilitate the reunification of the child safely and appropriately within a timely fashion and to ensure the strength and stability of the reunification. In the case of a child who has been returned home, the services and activities shall only be provided during the 15-month period that begins on the date that the child returns home."

_____
Jackson, P. J.

WE CONCUR:


_____
Simons, J.


_____
Burns, J.


A163378/*Edith D. v. Super. Ct. (Contra Costa County Children & Fam. Services Bur.)*

17